**RESERVISTS COMMITTEE TO STOP
the WAR et al., Plaintiffs,**

v.

**Melvin LAIRD et al., Defendants.**

**Civ. A. No. 1429–70.**

United States District Court,
District of Columbia.

April 2, 1971.

William A. Dobrovir, Washington, D. C., for plaintiffs.

Stuart E. Schiffer, Dept. of Justice, Mary E. Folliard, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This case presents the discrete question whether under Article I, Section 6, Clause 2 of the Constitution of the United States a person may at the same time be a member of Congress and hold a commission in the Armed Forces Reserve. The meaning and effect of this constitutional provision have never before been determined by a court. There is no factual dispute, and the legal issue has been tendered on cross-motions for summary judgment and has been fully briefed and argued.

Article I, Section 6, Clause 2 of the Constitution reads in its entirety as follows:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

Plaintiffs ask the Court to implement this constitutional requirement by declaratory judgment and by injunction against the Secretary of Defense and the Secretaries of the Army, Navy, and Air Force, upon the undisputed showing that at the present time 117 Senators and Representatives hold commissions in the Army, Navy, Air Force or Marine Corps Reserves subject to the rights and duties of reservists as specified in 10 U.S.C. chs. 11 and 39. This action does not seek to remove any Congressman from his elect-

ed office, nor to declare that any Congressman lacks the qualifications for the Senate or the House of Representatives. Rather it proceeds on the assumption that the Executive branch can be directed to take steps that will eliminate any office inconsistent with the constitutional mandate.

Initially a determination must be made as to whether plaintiffs have standing to bring this action. The issue then becomes whether a commission in the Reserve is an "office under the United States." For reasons that will appear, the Court is satisfied that plaintiffs have the requisite standing, and a determination is thus required whether a Reserve commission is within the ambit of "office" as that term is used in the Constitution. Because the Clause must be considered on the merits and its meaning and effect has some bearing on resolution of the standing question, the Court will first consider the merits before turning to a more detailed discussion of the justiciability of the controversy and the nature of the relief that shall be granted in this case.

## I. *The Meaning and Purpose of the Clause*

At the outset it will assist an understanding of the issues here presented to review briefly the origin and intended meaning of the constitutional provision this litigation puts into focus. The sources of this review are primarily the proceedings of the Constitutional Convention and certain passages in the Federalist Papers.

The wording of the Clause as reported to the Constitutional Convention by the Committee of Detail was as follows:

> The members of each House shall be ineligible to, and incapable of holding any office under the authority of the United States, during the time for which they shall respectively be elect-

ed: and the members of the Senate shall be ineligible to, and incapable of holding any such office for one year afterwards.[1]

It will be noted that this clause contained two distinct prohibitions: one against the simultaneous holding of incompatible offices, and the other against the appointment of a member of Congress to executive office during the term for which he was elected and, in the case of Senators, for one year thereafter.

The wisdom of the "incompatibility clause," barring the simultaneous holding of executive and legislative office, was universally accepted throughout the debates in the Convention. The discussion turned around the desirability of the "ineligibility clause," which prohibited a member of either House from resigning his legislative duties to accept executive office. While this discussion was therefore a bit tangential to the key issue presented here—that of the incompatibility of offices—it is highly informative as to the true meaning and purpose of that portion of the final Article which directs that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."

This clause had its origin in a strong belief by the Framers in the principle of separation of powers, and a desire to avoid the example of England, where, the Framers believed, elected officials had been subverted by appointments to office by the Crown. This view had such strength that strong objections were raised to weakening the original proposal by amendment in any respect.

A few of many instances may be cited to give the flavor of the debates. Elbridge Gerry warned:

> It appears to me, that we have constantly endeavored to keep distinct the three branches of government; but if we agree to this motion, it must be destroyed by admitting the legislators

---

1. 2 Farrand, Records of the Federal Convention of 1787, at 180 (1911). A similar provision in the Randolph Resolutions, or Virginia Plan, would have barred members of Congress from both federal and state offices. 1 *id.* at 20.

to share in the executive, or to be too much influenced by the executive, in looking up to him for offices. (1 Farrand at 393.)

To a suggestion that "in this instance we refine too much," Mr. Butler responded:

We have no way of judging mankind but by experience. Look at the history of the government of Great Britain, where there is a very flimsy exclusion —Does it not ruin their government? A man takes a seat in parliament to get an office for himself or friends, or both; and this is the source from which flows its great venality and corruption. (1 Farrand at 379.)

Mr. Mason was also conscious of the British experience:

I admire many parts of the British constitution and government, but I detest their corruption. Why is the power of the crown so remarkably increased the last century? A stranger, by reading their laws, would suppose it considerably diminished; and yet, by the sole power of appointing the increased officers of government, corruption pervades every village in the kingdom. If such a restriction should abridge the right of election, it is still necessary, as it will prevent the people from ruining themselves; and will not the same causes here produce the same effects? I consider this clause as the cornerstone on which our liberties depend—and if we strike it out we are erecting a fabric for our destruction. (1 Farrand at 380–81.)

In response to one amendment offered to weaken the eligibility clause, Colonel Mason "ironically proposed to strike out the whole section, as a more effectual expedient for encouraging that exotic corruption which might not otherwise thrive so well in the American Soil." 2 Farrand at 284.

Alexander Hamilton eloquently underlined the essentiality of barring Congressmen from holding other office while they retained their membership, even while arguing against further exclusions:

I confess there is danger where men are capable of holding two offices. Take mankind in general, they are vicious—their passions may be operated upon. [But] we have been taught to reprobate the danger of influence in the British government, without duly reflecting how far it was necessary to support a good government. . . . Our prevailing passions are ambition and interest; and it will ever be the duty of a wise government to avail itself of these passions, in order to make them subservient to the public good—for these ever induce us to action. Perhaps a few men in a state, may, from patriotic motives, or to display their talents, or to reap the advantage of public applause, step forward; but if we adopt the clause, we destroy the motive. I am therefore against all exclusions and refinements, except only in this case: that when a member takes his seat, he should vacate every other office. (1 Farrand at 381–82.)

The result of the debates was a compromise, first proposed by Madison and later slightly modified. It maintained inviolate the incompatibility of the offices, and limited the ineligibility provision governing offices Congressmen on resignation could accept to offices created or the emoluments of which were increased by Congress during the member's term in office. The purpose of the provision was succinctly stated by Madison in The Federalist No. 76, where in discussing the possibility of collusion between the President and the Senate on executive appointments, he quoted the entirety of Article I, Section 6, Clause 2, in its final form, as establishing "important guards against the danger of executive influence upon the legislative body * * *."

Significantly, some of those who had argued against the original broad exclusion were specifically concerned with the availability of the membership for military service. James Wilson, for example, feared "the fatal consequence in time of war, of rendering perhaps the best

Commanders ineligible." 1 Farrand at 376. Gouverneur Morris agreed, and proposed an exception for offices in the Army and Navy. 2 *id.* at 286, 289. It was perhaps these considerations which led to the compromise which in effect permitted Congressmen to resign and accept certain military or other offices.

Thus the Clause has consistently declared an incompatibility of legislative and executive or judicial offices, rather than a standing qualification (such as age, citizenship or residency) for membership in Congress. It was designed to ensure the integrity of a particular form of government, by preventing encroachments upon the separation of powers; and any violation of the Clause was seen to injure all citizens of the United States, rather than a particular group or the constituents of a particular Congressman.

## II. *Status of Reserve Officers under the Clause.*

Against this background the Court turns to a consideration of the controversy over whether a commission in the Reserve is an "office under the United States." Plaintiffs sought extensive discovery into Pentagon files to determine the extent of the activities of each Congressman in the Reserve to develop his perquisites from and duties toward the Executive resulting from his commission, with particular attention to those members who have long served as members of the Armed Services Committees of the House and Senate. The Court refused to permit such inquiries. The question of whether or not a Reserve commission is "an office under the United States" can be resolved on the basis of the controlling statutes and decisions, without

more, since a showing of actual favoritism or conflict of interest is not necessary to effectuate the purpose of the Clause.

The Reserve is divided into "Ready," "Standby," and "Retired" components. With a single exception, all Congressmen in the Reserve are classified in either Standby or Retired Reserve components.[2] Congressmen in Standby status do not receive pay, but may elect to participate in training and earn promotion and retirement credits. Congressmen in Retired Reserve may receive pay if otherwise eligible, though fewer than twenty do so. All members of the Reserve, including those in Retired status, are subject to call to active duty without their consent in time of war or national emergency.

■ ■ The term "office" was defined in United States v. Hartwell, 6 Wall. (73 U.S.) 385, 393, 18 L.Ed. 830 (1867), as "a public station, or employment, conferred by the appointment of Government. The term embraces the ideas of tenure, duration, emoluments, and duties." The question whether a commission in the 1916 National Guard fit this definition was considered at length by the House Committee on the Judiciary. After outlining the status and duties of an officer in the Guard and reviewing the legislative precedents with respect to Congressmen whose seats were declared vacant by virtue of their acceptance of an Army or Militia commission, the Committee concluded that a Congressman was not entitled to hold a commission in the National Guard. H.R. Rep.No. 885, 64th Cong., 1st Sess. (June 29, 1916). A commission in the modern Armed Forces Reserve cannot fairly be distinguished from a commission in the

---

2. There are, in addition, two Congressmen who hold commissions in the Army National Guard. Though the Army National Guard is a "Reserve component," 38 U.S.C. § 101(27), and its officers are "federally recognized," 32 U.S.C. §§ 307, 310, appointments to office in the Guard are made by the governors of the various states. The Secretary of Defense and the other defendants, therefore, do not

have the power to remove the commissions of those Congressmen who are officers in the Guard, and no cause of action is stated with respect to those two Congressmen. No determination is made herein as to whether a commission in the National Guard is an "office under the United States" for purposes of Article I, Section 6 of the Constitution.

1916 National Guard for purposes of Article I, Section 6, Clause 2.[3] The question is, therefore, whether the reasoning of the Committee, consistent with the holding of the Supreme Court, was erroneous, or whether subsequent events or rulings render it an anachronism. It is clear that such is not the case.

■ Defendants rely primarily on 5 U.S.C. § 2105(d), enacted in slightly different form in 1930. It reads:

> A Reserve of the armed forces who is not on active duty or who is on active duty for training is deemed not an employee or an individual holding an office of trust or profit * * * under * * * the United States because of his appointment, oath, or status, or any duties or functions performed or pay or allowances received in that capacity.

Were this statute intended by Congress to exempt Reserve officers from the terms of Article I, Section 6 of the Constitution, that determination should receive careful consideration by the Court. The legislative history of the statute, however, precludes such an interpretation. In the exceedingly brief floor debate on the bill, Senator Couzens suggested that it was an attempt to remove a Reserve officer from the definition of "office" as used in the Constitution, but admitted that the Chairman of the Military Affairs Committee, Senator Reed, "doubts whether this proposed legislation will remedy the situation." 72 Cong. Rec. 11881, 71st Cong., 2d Sess. (June 27, 1930). Senator Walsh then objected to the bill as "too sweeping." When the bill came to a vote later in the day, Senator Reed reported that he had had time to explain the bill to Senator Walsh, and that Walsh "had no further objection." *Id.* at 11892. The narrow purpose of the

bill was explained in the House committee report, which stated that the statute was enacted "to remedy a condition occasioned by a ruling of the Attorney General that prevents Reserve officers, who are attorneys at law, from practicing before the Treasury Department or from performing other work that the law forbids officers of the Government to undertake." H.R.Rep.No.1884, 71st Cong., 2d Sess., at 2 (1930).

Defendants also cite Simmons v. United States, 55 Ct.Cl. 56 (1920), for the proposition that a Reserve officer is not an "officer under the United States." In that case, the Court of Claims granted the motion of an attorney who was a Reserve officer for leave to prosecute a claim in that court against the United States, despite the provisions of Section 5498 (now 18 U.S.C. § 205) which barred officers of the United States from doing so. This decision was in accord with the later determination of Congress embodied in 5 U.S.C. § 2105(d), but like that statute, had no effect on the scope or interpretation of the constitutional bar against Congressmen holding incompatible offices.

■ Implicit in the *Simmons* case and the 1930 statute is undoubtedly a recognition of the limited nature of the relationship between the Executive branch and a private citizen who may be an inactive Reserve officer. Where Congress is concerned, however, the incompatibility clause must be applied in light of the purpose of the Framers, who erected an inflexible barrier against Congressmen holding or being appointed to any other office under the United States. Moreover, given the enormous involvement of Congress in matters affecting the military, the potential conflict between an office in the military and an office in

---

3. Much like the 1916 National Guard, officers of the Reserve are subject to call and assignment by the President; their salaries and expenses. are paid from federal funds; they are subject to the Uniform Code of Military Justice while on duty or while in Retired status; they enlist for definite terms; and they subscribe to the oath of office required of all civil servants. Unlike the Guard, Reserve officers are appointed by the President and retain their commissions at his pleasure.

Congress is not inconsequential.[4] The words of the House Committee on the Judiciary in 1916 have lost none of their force:

> It may be claimed, however, by some that under the Act of Congress federalizing the militia of the several States there are numerous small offices created of little importance, and, therefore, outside of the intent of the framers of this clause of the Constitution. But no line can be drawn between the large and small office. The Constitution prohibits a Member of Congress from holding "any" office under the United States while a member of either House. If a Member should hold any office under the United States, the prohibition of the Constitution at once intervenes and declares that he shall not "be a Member of either House."

### III. *Standing.*

The issue now before the Court has remained unresolved these many years in part because of earlier concepts in the law that rigidly restricted standing to sue. In recent years the Supreme Court has greatly expanded the concept of standing and in this Circuit the concept has now been almost completely abandoned. A review of the decisions is appropriate in view of defendants' vigorous challenge on the basis of lack of standing.

Many of the technicalities which historically surrounded the concept of standing were cleared away by the Supreme Court in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The Court focused the question of standing in the constitutional sense upon "whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Id.* at 101, 88 S.Ct. at 1953. An adversary context was said to be ensured where the complainants have "a personal stake in the outcome of the controversy." In many cases, that personal stake is readily apparent, as where a corporation alleges economic injury from unfavorable agency action, or where members of a minority group allege discrimination in the allocation of government services. In other cases, however, the nature of the alleged injury is diffuse or intangible. In a long series of cases prior to *Flast,* where personal stake and injury were not apparent, this circumstance was sufficient to deny standing to individual citizens and thus effectively to preclude judicial review of a challenged action.

The Court in *Flast,* however, abandoned the requirement of a significant demonstrable injury to the plaintiff and substituted a test designed to ensure that the plaintiff, despite the generality of his alleged injury, is a "proper and appropriate party to invoke a federal court's jurisdiction." 392 U.S. at 103, 88 S.Ct. at 1954. The test announced is "whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.* at 102, 88 S.Ct. at 1953. If this test is satisfied, the Court said, a complainant has standing in the sense that his claim presents a "case or controversy" under Article III of the Constitution.

The question of standing still involves what the Supreme Court has termed a "rule of self-restraint" designed to avoid passing on premature or ill-focused constitutional claims. Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). The latest expression of such a "rule" is found in Ass'n of Data

---

4. It is relevant in this connection to note that while less than one-fourth of the members of the 91st Congress were Reserve officers, those members were disproportionately represented on the Committees concerned with military affairs. Reserve officers constituted more than half the membership of the Senate Armed Services Committee (including one Major General in the Army Reserve, retired with pay, who was President of the Reserve Officers' Association); one-third of the House Armed Services Committee; and two-thirds of the House Veterans Affairs Subcommittee on Compensation and Pension.

Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The Court there noted that the question of standing concerns not only the "case" or "controversy" test, but "the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

■ Plaintiffs—an association of present and former Reservists organized to oppose the war in Vietnam, and five individual members of that organization —purport to represent several different "classes" in this action. Standing is claimed as Reservists, as persons opposed to the Vietnam War, as taxpayers and as citizens. Only their status as citizens gives standing in this case. Plaintiffs in their capacity as Reservists allege that they are injured by favoritism toward Congressmen in assignments, promotion, and perquisites within the Reserves. No evidence has been offered in support of this claim. The Court barred discovery on the question. Even were these allegations proved, it is doubtful whether plaintiffs' interests as Reservists are within the zone of those interests which the Clause was designed to protect. Nor is plaintiffs' opposition to the war in Vietnam sufficient to give standing in this case. That controversy is irrelevant to the issues presented, and the Court rejects any suggestion that the relief requested can responsibly be said to have any bearing whatsoever on the outcome of that controversy.

Plaintiffs' standing as taxpayers must also fail under Flast v. Cohen, *supra*, for the constitutional provision which they invoke cannot fairly be construed as a limitation on the taxing and spending power of Congress. The Clause here in

issue is a limitation on the right of Congressmen to hold other offices which are incompatible under the separation-of-powers doctrine. While Congressmen in their positions as Reservists also receive funds from the public treasury, it is not the expenditures thus incurred, but the possibility of undue Executive influence over the Congress, which the Constitution seeks to forbid. Plaintiffs' claim in no way depends upon the fact that some Congressmen receive pay as Reservists, and hence there is not that "logical nexus between the status (of taxpayers) and the claim sought to be adjudicated" which is required by *Flast*.

Plaintiffs, do, however, have standing to sue in their capacity as citizens of the United States. There are undoubtedly very few instances in which plaintiffs who assert merely the undifferentiated interest of citizens have a personal stake in the outcome sufficient to support standing in the constitutional sense.[5] Several considerations move the Court to hold that plaintiffs have standing as citizens in this instance. First, while any injury which might result from Congressmen holding Reserve commissions is hypothetical, the hypothesis is not concocted by plaintiffs but underlies the constitutional provision itself. Like a conflict-of-interest statute, the constitutional bar addresses itself to the potential for undue influence rather than to its realization. Cf. Board of Governors v. Agnew, 329 U.S. 441, 449, 67 S.Ct. 411, 91 L.Ed. 408 (1947). The Court will not lightly conclude that a constitutional provision so highly regarded and hotly debated by the Framers serves no real purpose.

Second, the issue tendered is a narrow one and involves a precise self-operative provision of the Constitution. This is not a case where plaintiffs seek "to em-

5. There have been suggestions that a challenge to governmental action in violation of the Establishment Clause might be such a case. *See* Flast v. Cohen, 392 U.S. 83, 115–116, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968) (Fortas, J., concurring); Flast v. Gardner, 271 F.Supp. 1, 8 (S.D.

N.Y.1967) (Frankel, D.J., dissenting); Committee for Public Education and Religious Liberty v. Rockefeller, 322 F. Supp. 678 (S.D.N.Y.1971). *But see* Lemon v. Kurtzman, 310 F.Supp. 35 (E.D. Pa.1970).

ploy a federal court as a forum in which to air [their] generalized grievances about the conduct of government or the allocation of power in the Federal System." Flast v. Cohen, *supra*, at 106, 88 S.Ct. at 1956.

■ Third, the interest in maintaining independence among the branches of government is shared by all citizens equally, and since this is the primary if not the sole purpose of the bar against Congressmen holding executive office, the interest of plaintiffs as citizens is undoubtedly one which was intended to be protected by the constitutional provision involved.

■■ Finally, there can be no doubt that this is a "case or controversy" in the common meaning of those words; the parties sharply conflict in both their interests and their views, and the case was ably briefed and argued. It is not irrelevant to note that if these plaintiffs cannot obtain judicial review of defendants' action, then as a practical matter no one can.[6]

IV. *Other Contentions as to Justiciability.*

■ The Government also contends that the constitutional prohibition against Congressmen holding executive office states only a qualification for membership in Congress, not a qualification for executive office. From this premise, it is concluded that no cause of

action lies against the Secretary of Defense or other executive officials to remove Congressmen from their offices in the Reserve; the only remedy under the provision is to remove the Reserve officer from his seat in Congress, and since each House is "the Judge of the Qualifications of its own Members" (Article I, Section 5), no remedy may be sought in any court. If the Government were correct in its initial premise, the case would seem to present a nonjusticiable "political question," in that there would exist "a textually demonstrable constitutional commitment of the issue to a coordinate political department * * *." Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).[7]

In support of their argument, defendants point first to the wording of the Clause itself, which makes a "Person holding any Office" ineligible to sit in Congress, and further suggest that the change in wording from the clause as originally reported to the Convention—making members of either House "ineligible to and incapable of holding any office"—indicates that the Framers intended for enforcement of the provision to come exclusively through removal of an officer from his seat in Congress. However, the records of the Convention, as previously discussed, reveal that the Clause was intended simply to declare the incompatibility of a seat in Congress and an office in the Executive or the Ju-

6. Defendants suggest that the proper procedure to test the legality of a Congressman's commission in the Reserves is *quo warranto*. Such a procedure could be invoked only by an individual who claims title to the same position held by a Congressman. It is clear that, even if the holding of executive office be deemed a disqualification which can be asserted against a Congressman in *quo warranto*, the contingency of such a suit is remote and is unrelated to the question whether a general public interest is being harmed by the challenged practice of allowing Congressmen to hold Reserve commissions.

7. In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969),

the Supreme Court noted that a house determination as to whether a member possessed the three "standing qualifications" for Congress (age, citizenship, and residency) might well be insulated from judicial review by the political question doctrine. The Court raised but did not reach the question whether the bar against Congressmen holding other offices under the United States is a "qualification" of which each House is the sole judge under Article I, Section 5. The question is answered in the affirmative by one commentator. Dionisopoulos, A Commentary on the Constitutional Issues in the Powell and Related Cases, 17 J.Pub.Law 103, 115 (1968).

diciary. Though the first part of what is now Article I, Section 6, Clause 2—dealing with the eligibility of Congressmen for appointment to executive office —was debated at length, the part which declared the incompatibility of the offices was never questioned. The final wording of the Clause was drafted by the Committee of Eleven to whom the provision had been referred after the debate on Madison's compromise. 2 Farrand at 483. There is no indication that its changes were intended to have any effect on the substance of the incompatibility provision.

 Defendants underline their argument by reference to the examples of Congressional enforcement of the constitutional provision in the Nineteenth and early Twentieth Centuries.[8] In each of these instances, however, it appears that the member whose seat was declared vacant had accepted a commission during his term in office. The Court's attention has not been directed to any case in which an elected Congressman was not seated by reason of an office he held at the time he first entered Congress; the congressional precedents involve members whose seats were declared vacant upon their acceptance of an appointment to another office while serving in Congress. It is the general rule that in the case of incompatible offices, "acceptance of the second office vacates the first." *Right of a Representative in Congress to Hold Commission in National Guard,* H.R.Rep.No.885, 64th Cong., 1st Sess., at 4 (1916). Thus it is clear that defendants, as the superiors of Reserve officers within the Executive branch, have the right and the power to remove Congressmen from the Reserve offices they held at the time of their election, and that their failure to do so is subject to judicial review.

 There is no basis for defendants' contention that the issue of a Congressman's entitlement to hold executive office has been committed by the Constitution to either the Legislative or the Executive departments. Undoubtedly, Article I, Section 5 commits to Congress the decision whether any individual is qualified to sit in Congress, but this does not bar judicial consideration of the question whether executive action must be taken to carry out a constitutional mandate.

## V. *Relief.*

 Plaintiffs are entitled upon the Court's finding to a declaratory judgment that Article I, Section 6 prohibits any Congressman from holding a commission in the Armed Forces Reserve during his term in office. It does not follow, however, that injunctive relief is necessarily appropriate. *See* Powell v. McCormack, 395 U.S. 486, 499, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In considering the prayer for an injunction, the the Court must take into account the importance of its action to persons not before the Court, and the fact that any resolution of the matter must necessarily involve coordinate branches of the Government. A number of factors impel the Court to deny injunctive relief in this case.

Congressmen have held commissions in the Reserve for a number of years, and though the matter has occasionally troubled both the Department of Defense and some members of Congress, the right of Congressmen to hold commissions has not been clarified.[9] In the absence of

8. Examples of cases in which Senators and Representatives were expelled from Congress upon their acceptance of military office may be found in 1 Hind's Precedents of the House of Representatives, §§ 486–99 (1907), and 6 Cannon's Precedents of the House of Representatives, §§ 60–64 (1936). Congress has also · on occasion solicited the opinion of the Attorney General with respect to individual cases arising under the Clause. *See, e. g.,* 40 Ops. Att'y Gen'l 201 (1943); 40 Ops. Att'y Gen'l 301, 303 (1949).

9. See the remarks of Senator Goldwater, 109 Cong.Rec. 13211–14 (1963). Senator Goldwater's proposal that the Senate investigate and rule upon the question was

an urgent necessity, and none is shown, the Court is loathe to take injunctive action which might prejudice the rights of Congressmen now seated who in some cases have been members of the Reserve for many years and may leave Congress at the end of their present terms. There is more than one way to remove the incompatibility. Individual Congressmen should be free to make their own choice. In any event, if the issue of incompatibility is finally determined on appeal consistent with this decision, there is no reason to believe that Congress and the Executive will be unable to accommodate themselves voluntarily to the decision, and to phase out incompatibility having due regard for the special status of Congressmen then seated.

An order granting the prayer for a declaratory judgment and denying injunctive and other relief requested by plaintiffs is attached.

## ORDER

Upon consideration of cross-motions for summary judgment, the memoranda filed in support thereof, and the oral argument of counsel, and the Court having this day filed a Memorandum Opinion containing its conclusions of law based on the undisputed facts, it is this 2 day of April, 1971,

Ordered that plaintiffs' motion for summary judgment is granted as to the claim for a declaratory judgment, and it is hereby declared that Article I, Section 6, Clause 2 of the Constitution renders a member of Congress ineligible to hold a commission in the Armed Forces Reserve during his continuance in office; and it is further

Ordered that plaintiffs' motion is denied, and defendants' motion is granted, as to all claims for relief other than such declaratory judgment; as to these claims the complaint is dismissed.

not accepted. The Department of Defense has several times issued special directives concerning the status of Congressmen in the Reserve, but has never suggested that they resign their commissions.