**John S. ATLEE et al.,**

v.

**Melvin LAIRD, Individually and as Secretary of the Department of Defense.**

**Civ. A. No. 71–2324.**

United States District Court,
E. D. Pennsylvania.

March 28, 1972.

David Kairys, David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., for plaintiffs; Michael Krinsky, Rabinowitz, Boudin & Standard, New York City, of counsel.

Louis C. Bechtle, U. S. Atty., Warren D. Mulloy, John T. Thorn, Asst. U. S. Attys., Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

The plaintiffs in this suit allege that the prosecution of the war in Southeast Asia by this government violates various provisions of the United States Constitution, Treaties of the United States, and doctrines of international law. They seek a permanent injunction against the expenditure of funds for this war which have been authorized and appropriated by Acts of Congress. The defendant in this case is Melvin Laird, Secretary of the United States Department of Defense. The United States government, through the office of the United States Attorney for the Eastern District of Pennsylvania, has been granted leave to intervene. Originally, Richard M. Nixon, President of the United States, was a defendant, but on January 20, 1972, the government's motion to dismiss him as a party defendant was granted. Atlee v. Nixon, D.C., 336 F. Supp. 790. The court has jurisdiction of the case under 28 U.S.C. § 1331.

■ Plaintiffs have asked that a three-judge court be convened to hear this action. Since the plaintiffs seek an injunction restraining the expenditure of funds authorized and appropriated by Acts of Congress on the ground that such expenditures are repugnant to the United States Constitution, this is clearly a case which requires a three-judge district court under the terms of 28 U. S.C. § 2282. *See* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

The government, however, has filed a motion to dismiss the suit with this court, offering several separate grounds in support of its motion. My initial de-

termination must be whether I, as a single district judge, have the power to dismiss this suit on the grounds alleged by the government, rather than request the convening of a three-judge district court.

In Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933) (per curiam), the Court held that a single judge could dismiss the action rather than request that a three-judge court be convened where there was neither diversity jurisdiction, nor federal question jurisdiction because the federal question involved was clearly insubstantial. " * * * [T]he provision requiring the presence of a court of three judges necessarily assumes that the District Court has jurisdiction." Poresky, *supra*, 290 U.S. at 31, 54 S.Ct. at 4.

■ The three-judge statute was later amended, and 28 U.S.C. § 2284(5) now provides that "[a] single judge shall not * * * dismiss the action, or enter a summary and final judgment." Despite the language of this provision, the decision in Ex parte Poresky is still good law. The provision has been interpreted to be a limitation on a single district judge's power only after a three-judge court has been properly called. The decisions have uniformly held that the single district judge to whom an action is originally presented may refuse to request a three-judge court and dismiss the action if he concludes that the general requisites of federal jurisdiction are not present. *E. g.,* Port of New York Authority v. United States, 451 F.2d 783 (C.A. 2, 1971); Eastern States Petroleum Corporation v. Rogers, 108 U.S.App. D.C. 63, 280 F.2d 611 (1960); Jacobs v. Tawes, 250 F.2d 611 (C.A. 4, 1957); Hickmann v. Wujick, 333 F. Supp. 1221 (E.D.N.Y.1971); Suskin v. Nixon, 304 F.Supp. 71 (N.D.Ill.1969).

■ It is equally clear that a single judge must request the convening of a three-judge court if jurisdiction is present. A single judge may not decide that abstention is proper while a state court passes on the constitutional issue involved, and on that basis refuse to convene a three-judge district court. Idlewild Bon Voyage Liquor Corp v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L. Ed.2d 794 (1962) (per curiam); Abele v. Markle, 452 F.2d 1121 (C.A. 2, 1971); Landry v. Daley, 280 F.Supp. 929 (N.D. Ill.1967).

> "When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute." Idlewild, *supra,* 370 U.S. at 715, 82 S.Ct. at 1296.

■ Just as abstention is not proper, the single district judge may not refuse to request a three-judge court because he concludes that the case is better suited for declaratory relief rather than the injunctive relief which was also requested by the plaintiff. National Mobilization Committee to End War in Viet Nam v. Foran, 411 F.2d 934 (C.A. 7, 1969).

It thus becomes necessary for me to determine which of the government's proposed grounds for dismissal of this suit involve jurisdictional questions which this court may consider.[1] The government has advanced four reasons for dismissal: (1) the suit is identical to other cases filed against the same defendants in other federal courts; (2) the complaint presents a nonjusticiable political question; (3) the action in ef-

---

1. This admittedly is no easy task. In fact, the test has been strongly criticized as unworkable. "It is fruitless to pick nits over what is 'really' a matter of jurisdiction. 'Jurisdiction' is but a handy name with which to describe a collection of legal consequences." Currie, The Three-Judge District Court In Constitutional Litigation, 32 U.Chi.L.Rev. 1, 25 (1964).

fect is an unconsented suit against the United States; and (4) the plaintiffs lack standing to maintain this action. I have concluded that my power to rule on the government's motion extends only to the latter two grounds urged for dismissal.

▮ It is first argued that this suit should be dismissed because numerous similar actions with sometimes identical complaints have been filed against the same defendants in various federal courts across the country. The government contends that a dismissal here would foster judicial economy and avoid the vexatious results of permitting multiple lawsuits. We note that the government has failed to show a single other suit challenging expenditures for the war which has been brought by the plaintiffs in this suit. The fact that counsel representing the plaintiffs in these various anti-war actions are the same would not seem to permit the inference that the plaintiffs in this suit are only "nominal," and that behind them lurk the same "real parties in interest" who have actually brought this and all the other similar actions. In any event, I will not rule on this ground for dismissal because it does not present a jurisdictional issue, but one which is addressed to a court's discretion. *See* Eastern States Petroleum & Chemical Corporation v. Walker, 177 F.Supp. 328, 334 (S.D.Tex.1959). Of course, if a three-judge court is convened, the government may renew its motion, directing it to that court's power to dismiss for any proper reason, jurisdictional or otherwise.

As an alternative basis for dismissal, the government takes the position that the conduct of foreign policy, and particularly the manner and extent of financial assistance to foreign nations is committed to the discretion of Congress and lies outside the power and competency of the judiciary. It is contended that what the plaintiffs seek to litigate here is a nonjusticiable political question and therefore the court lacks jurisdiction over the subject matter.

▮ Actually, this argument confuses two separate grounds for denying relief. Bell v. Hood, 327 U.S. 678, 66 S. Ct. 773, 90 L.Ed. 939 (1946), made clear that a court must entertain a suit where the complaint is so drawn as to seek recovery directly under the Constitution or the laws of the United States. Such a suit may be dismissed for want of jurisdiction only if the alleged claim under the Constitution or federal statute is sham, made solely for the purpose of obtaining jurisdiction, or is insubstantial and frivolous. "Jurisdiction * * * is not defeated * * * by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Bell v. Hood, *supra*, 327 U.S. at 682, 66 S.Ct. at 776.

▮ At the heart of plaintiffs' constitutional claims is the contention that the war in Southeast Asia is being waged in violation of Art. I, Sec. 8, Cl. 11 which provides that "[t]he Congress shall have Power * * * To declare War * * *." The plaintiffs allege that the Constitution requires a Congressional declaration of war or an equivalent act of Congressional authorization for the military activities being waged in Southeast Asia, and that in fact Congressional action which has been taken [2] does not fulfill this requirement. This claim is not so insubstantial and devoid of merit as to warrant dismissal on the ground of lack of jurisdiction of the subject matter. Commonwealth of Massachusetts v. Laird, 451 F.2d 26, 29 (C.A. 1, 1971).

▮ In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court emphasized that the question of subject matter jurisdiction should not be confused with the problem of whether a suit presents a nonjusticiable political question.

---

**2.** *E. g.*, Acts of appropriation for war activities and extensions of the Selective Service Act.

"The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not 'arise under' the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a 'case or controversy' within the meaning of that section; or the cause is not one described by any jurisdictional statute." Baker v. Carr, *supra*, 369 U.S. at 198, 82 S.Ct. at 700.

■ In an action which on its face invokes the three-judge court statute, it is clear that a single judge is prohibited from any ruling on the merits of the action.[3] *E. g.*, Stratton v. St. Louis Southwestern R. Co., 282 U.S. 10, 51 S. Ct. 8, 75 L.Ed. 135 (1930). As the political question doctrine has developed, the inquiry into justiciability must necessarily proceed to a point which becomes entangled with the merits of the action.

In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), Adam Clayton Powell, Jr. alleged that the United States House of Representatives unconstitutionally excluded him from a seat in the 90th Congress. In considering whether the political question doctrine rendered the suit nonjusticiable, the Court considered many factors, but the main focus of its inquiry was whether there has been a textually demonstrable constitutional commitment of the issue to another coordinate branch. The defendants argued that the House, and the House alone, has the power to determine who is qualified to be a member.

"In order to determine whether there has been a textual commitment to a co-ordinate department of the Government, we must interpret the Constitution. In other words, we must first determine what power the Constitution confers upon the House through Art. I, § 5, before we can determine to what extent, if any, the exercise of that power is subject to judicial review." Powell v. McCormack, *supra*, 395 U.S. at 519, 89 S.Ct. at 1963.

In deciding whether this suit presents a nonjusticiable political question, an interpretation would have to be made by this court of the very clause of the Constitution, Art. I, Sec. 8, Cl. 11, which plaintiffs rely on on the merits. The First Circuit recognized this unavoidable entanglement in a recent decision which held that the war in Southeast Asia presented a nonjusticiable political question.

"In arriving at this conclusion we are aware that while we have addressed the problem of justiciability in the light of the textual commitment criterion, we have also addressed the merits of the constitutional issue. We think, however, that this is inherent when the constitutional issue is posed in terms of scope of authority." Commonwealth of Massachusetts v. Laird, 451 F.2d 26, 33–34 (C.A. 1, 1971).

Thus, I conclude that as a single district judge I lack the power to rule on the government's motion to dismiss on the ground that the suit presents a nonjusticiable political question. *See* Abele v. Markle, 452 F.2d 1121, 1125 (C.A. 2, 1971); *see generally* Scharpf, Judicial Review And The Political Question: A Functional Analysis, 75 Yale L.J. 517 (1966).

---

3. Except, as it may be determined, that the act attacked is without a doubt constitutional or unconstitutional. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed.

152 (1933) (per curiam); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed. 2d 512 (1962) (per curiam).

The government also argues that this suit should be dismissed because while nominally against officers of the United States, it is in reality against the government itself. If its contention is correct that this is actually a suit against the United States, then a court would be without jurisdiction to hear the suit since there is no applicable statute waiving sovereign immunity. See Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 687, 69 S.Ct. 1457, 93 L. Ed. 1628 (1949). Since it is a jurisdictional issue, this court could dismiss the suit if it is barred by sovereign immunity. Osage Tribe of Indians v. Ickes, 45 F.Supp. 179 (D.D.C.1942).

Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), provides the guidelines for the law of sovereign immunity. A suit is against the sovereign and barred if the judgment sought would expend itself on the public treasury or interfere with the public administration. It is also barred if the effect of the judgment would be to compel the government to act or restrain it from acting. However, two exceptions are recognized to this rule. A suit is not barred by the doctrine of sovereign immunity if it is alleged that the actions of the officers challenged are beyond their statutory authority or, though authorized by statute, the powers exercised or the manner in which they are exercised are in violation of the Constitution.

This suit clearly comes within the second exception to the rule of sovereign immunity. The expenditure of funds by the defendant to further the prosecution of the war in Southeast Asia is alleged to be in direct conflict with the requirements of Art. I, Sec. 8, Cl. 11 of the Constitution. Sovereign immunity is no bar to this action challenging the financing of the war in Southeast Asia. Berk v. Laird, 429 F.2d 302 (C.A. 2, 1970); Mottola v. Nixon, 318 F.Supp. 538 (N.D.Cal.1970). *See also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). *Contra* Luftig v.

McNamara, 126 U.S.App.D.C. 4, 373 F. 2d 664 (1967) (per curiam).

The final ground urged for dismissal before this court is that the plaintiffs lack standing to maintain this action. Decisions denying standing have sometimes been based on a rule of self-restraint which the Court has developed, rather than a jurisdictional reason. Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). The doctrine is somewhat complicated, as it "has become a blend of constitutional requirements and policy considerations." Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). For whatever reasons a court may deny standing, the Court's decisions indicate that standing may not be conferred unless consistent with jurisdictional limitations which are embodied in Article III.

"Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies'." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

Therefore, I will rule on the government's motion to dismiss on the ground of lack of standing in light of the case or controversy requirement of Article III. Abele v. Markle, 452 F.2d 1121 (C.A. 2, 1971). Plaintiffs have asserted standing as taxpayers, citizens, and voters. Each status must be scrutinized separately to determine whether any one of them is sufficient to confer standing to maintain this action. *See e. g.* Reservists' Committee to Stop War v. Laird, 323 F.Supp. 833 (D.D.C.1971).

In Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court distinguished an earlier decision, Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923),

which had denied standing to a federal taxpayer. In holding that a federal taxpayer had standing to challenge the allegedly unconstitutional expenditure of funds by Congress for aid to religious schools, the Court developed a two-part test for establishing standing as a federal taxpayer. First, the expenditure must be an exercise of congressional power under the taxing and spending clause of Art. I, Sec. 8 of the Constitution. Secondly, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations upon the congressional taxing and spending power.

In Flast, the Court found that the expenditure by Congress was made pursuant to its Art. I, Sec. 8, Cl. 1 power to spend for the general welfare, so that the first part of the test was satisfied. The Tenth Circuit has concluded that expenditures for the war have not been made under the taxing and spending clause but under the power to raise and support an Army and maintain a Navy, Art. I, Sec. 8, Cl. 12 and 13. Velvel v. Nixon, 415 F.2d 236 (C.A. 10, 1969). However, the matter is not at all clear. "[T]he government probably uses its spending power whenever it spends, even if the disbursement is also supported by some other granted power. Furthermore, many activities are neither primarily spending nor primarily regulatory—the Vietnam war, for instance." Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 633 (1968).

Even if the first part of the Flast test is considered fulfilled, the plaintiffs here still lack standing as taxpayers because of their failure to demonstrate that Congressional appropriations for the war violate specific constitutional limitations upon the taxing and spending power. In Flast, the First Amendment's Establishment Clause was alleged to be violated by the expenditures involved there, and the Court found that our history discloses that a specific evil feared by the drafters of the Establishment Clause was that the

taxing and spending power would be used to favor one religion over another, or to support religion in general. The plaintiffs here have not been able to offer sufficient support, historical or otherwise, for an interpretation of the war-making clause as having an implied purpose to act as a specific limitation on the manner in which Congress could make expenditures. Pietsch v. President of United States, 434 F.2d 861 (C.A. 2, 1970); Velvel v. Nixon, *supra*.

Our inquiry concerning standing is not ended because the only question involved in Flast was whether " * * * standing can be conferred on the taxpayer qua taxpayer consistent with the constitutional limitations of Article III." Flast, 392 U.S. at 101, 88 S.Ct. at 1953. " * * * [O]ur point of reference in this case is the standing of individuals who assert only the status of federal taxpayers. * * * " Flast, 392 U.S. at 102, 88 S.Ct. at 1953. The concurring opinion of Justice Fortas pointed to the issue now at hand.

"In terms of the structure and basic philosophy of our constitutional government, it would be difficult to point to any issue that has a more intimate, pervasive, and fundamental impact upon the life of the taxpayer—and upon the life of all citizens.

"Perhaps the vital interest of a citizen in the establishment issue without reference to his taxpayer's status, would be acceptable as a basis for this challenge. We need not decide this." Flast, 392 U.S. at 115–116, 88 S.Ct. at 1960.

Plaintffffs' possible standing as citizens must be analyzed in terms of the general criteria which have been developed by the Court.

"Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the

question of standing." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The "personal stake" need not of course be one that is unique to that individual, but may be shared by millions of others with a similar status, as the federal taxpayers in Flast.[4] The nature of the personal stake and interest necessary under Article III for standing was explained most fully by the Court in a recent decision where the requirements for standing to seek judicial review of administrative action were relaxed. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and see the companion case of Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). "The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." Data Processing, *supra*, 397 U.S. at 152, 90 S.Ct. at 829. "That interest, at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values." *Id.*, at 154, 90 S.Ct. at 830. In Data Processing the injury involved was an alleged economic one, a potential loss of business to the petitioners as competitors of the national banks to which the administrative ruling was directed. Barlow, *supra*, also involved an economic injury. The Court in its interpretation of Article III requirements explained that it had mentioned non-economic values so that it could "emphasize that standing may stem from them as well as from the economic injury on which petitioners rely here." Data Processing, 397 U.S. at 154, 90 S. Ct. at 830.

For an economic injury to qualify as a sufficient personal stake, it need not be of any particular magnitude. *See* Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ($1.50 poll tax). It has been estimated that the economic injury to the average federal taxpayer caused by the Congressional expenditure attacked in Flast amounted to all of 12 cents ($.12). Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 611 (1968).

In this case plaintiffs allege that many billions of dollars have been spent in prosecution of the war in Southeast Asia, at the rate of approximately two billion dollars every month. They have alleged that this federal spending has in large part caused a rapidly increasing inflation from which all citizens suffer. War induced inflation-recession is alleged to have decreased the actual purchasing power of the dollar.[5] The government has not offered any evidence rebutting these allegations of economic injury, and since this is a motion to dismiss, all well pleaded facts are admitted. Therefore, I find that this alleged economic injury caused by the prosecution of the war is sufficient to confer standing.

4.  It seems a misnomer to speak of "personal stake" when plaintiff's interest is no different than millions of others, and the action seems primarily concerned with vindicating a public interest in an important national issue rather than a private wrong. Perhaps, such actions should more properly be designated "public actions" and be measured by different criteria for standing than "private actions" involving a distinct and discriminating injury. In any event, plaintiffs in this case will have to establish standing within the framework of Article III requirements now recognized by the Court. *See Flast*, 392 U.S. 83, 116–133, 88 S.Ct. 1942 (dissent of Harlan, J.) ; Jaffe, The Citizen As Litigant In Public Actions : The Non-Hohfeldian or Ideological Plaintiff, 116 U.Pa.L. Rev. 1033 (1968) ; Jaffe, Judicial Control Of Administrative Action, 459–500 (1965).

5.  Inflation is recognized as a time-honored device for financing wars. For an interesting discussion of means to finance World War II see the position papers of the Tax Institute Symposium of 1942. Financing The War 9 (Warren), 28–33 (Jones) (1942). The court, of course, does not venture an opinion as to whether the prosecution of the war in Southeast Asia has induced inflation.

■ Perhaps more fundamentally, plaintiffs have standing here as citizens to challenge the war because of its non-economic impact as well. As Data Processing pointed out, the interests to be protected may at times reflect other values. Conservationist groups, for instance, have been granted standing to challenge agency action which would affect natural resources such as our rivers and forests. Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (C.A. 2, 1965); Sierra Club v. Hardin, 325 F.Supp. 99 (D.Alaska 1971).[6] There are few citizens who could be so callous as to be unmoved by the almost daily reports in the media of the death and destruction being caused by this war. The loss in human resources has been, and continues to be, staggering. In terms of American lives alone, there have been the deaths of over forty-five thousand soldiers, with injuries to hundreds of thousands more. The blood of these men provides a sufficient "conservational" interest on the part of every citizen in saving the human resources of this nation.

The fact that our nation is at war also necessarily causes some threat to the personal safety and security of all the citizens, given the complexity of international relations and the advanced means of war that have been developed through technology. Finally, plaintiffs have alleged that the expenditure of billions of dollars on the war has resulted in there being less funds available to be expended on urgent domestic needs, such as the housing, health and education needs of citizens. Considering the huge expenditures on the war this cannot be dismissed as idle speculation. Plaintiffs' interests as citizens are clearly more compelling than any aesthetic or recreational interests which Data Processing said may confer standing.

■ In terms of Article III requirements for standing, besides demonstrating that a sufficient personal stake or interest is present, it must appear that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Data Processing, 397 U.S. at 153, 90 S.Ct. at 830. Art. I, Sec. 8, Cl. 11, which plaintiffs have alleged has been violated, provides that "[t]he Congress shall have Power * * * To declare War * * *." The words themselves don't contain any intention to protect the citizenry, but the history of our Constitution reveals that this assignment of power to Congress was not a mere happenstance without purpose. It was the intention of the framers of the Constitution to make it more difficult for the nation to engage itself in war with all the sufferings which this entails for its citizens, by lodging the power in a body of men, rather than allow one man to make such a vital decision. The British monarch was not considered a proper guide for defining the executive powers of the president in this country when it came to the matter of war. Madison, The Debates of the Federal Convention of 1787, 140–41, 438–39 (Elliot ed. 1845); see Pusey, The Way We Go To War, 41–48 (1969).

The citizen's interest in having his nation free of war was the very one being considered when the Constitution was written vesting the power to authorize war with the Congress, rather than the President. Thus, the plaintiffs in this case have standing as citizens to

---

6. While these cases as well as *Data Processing* concerned whether standing to challenge administrative action had been conferred by Congress, they are applicable to the instant determination of whether plaintiffs have fulfilled the requirements of Article III, since Article III limitations on standing must always be observed. "Congress can, of course, resolve the question one way or another, save as the requirements of Article III dictate otherwise." *Data Processing*, 397 U.S. at 154, 90 S.Ct. at 830.

challenge the constitutionality of expenditures for the war.[7]

By holding that plaintiffs here have standing as citizens, the decision in Flast establishing criteria for federal taxpayer standing is not rendered a nullity. In fact, most challenges to Congressional expenditures would not involve issues of paramount national importance which have an impact on every citizen's life, such as a war.[8] Thus, there would be no citizen standing, and the litigant would have to establish standing as a federal taxpayer within the test developed by Flast.[9]

Recognizing standing in this case does not create a forum for "generalized grievances about the conduct of government or the allocation of power in the Federal System." Flast, 392 U.S. at 106, 88 S.Ct. at 1956. The complaint in this action presents not an airing of a "generalized grievance" about the government, but an attack against a particular war, alleging that the prosecution of this war has not and does not conform to the requirements of law. Rather than being a complaint about the allocation of power in the Federal System, it is essentially a claim that the President and the Congress have not acted in accordance with the allocation of power as it is provided in the Constitution with regard to war.

For the reasons indicated, I conclude that neither sovereign immunity nor Article III limitations on standing are a bar to maintenance of this suit. The government's motion to dismiss on these grounds is denied, and the court is without power to rule on the government's other grounds for dismissal which are non-jurisdictional. Consonant with the conclusions expressed in this opinion and simultaneously with its filing, I am requesting the Chief Judge of the Circuit to convene a three-judge court to hear this action.

---

7. Having found that plaintiffs have standing as citizens, it is unnecessary to pass on their claim of standing as voters. Past decisions of the Court seem to recognize such a basis for standing only when the integrity of the vote itself, or the election process has been the interest sought to be protected. *See, e. g.*, Baker v. Carr, 369 U.S. at 206–208, 82 S.Ct. 691.

8. Thus, I disagree with the Tenth Circuit's view that if a court recognized citizen standing to challenge the constitutionality of the war, "then obviously standing to sue can be found in every citizen to contest every congressional or executive action of general import and the doctrine of standing will have lost all meaning." Velvel v. Nixon, 415 F.2d 236, 238 (C.A.10, 1969). Judge Gesell, in a recent decision recognizing citizen standing to challenge the constitutionality of members of Congress holding commissions in the Armed Forces Reserve, observed that there would be very few instances where a plaintiff could establish standing as a United States citizen. Reservists Committee To Stop War v. Laird, 323 F.Supp. 833 (D.D.C.1971).

9. Unless, of course the plaintiff had some other status which conferred standing.