**UNITED STATES**

v.

**Airman First Class Charles M. LANE,
United States Air Force.**

**ACM S30339.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 18 March 2003.

Decided 17 Dec. 2004.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, Major Kyle R. Jacobson, Major Andrew S. Williams, Major Teresa L. Davis, and Captain David P. Bennett.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Robert V. Combs, and Captain C. Taylor Smith.

Before PRATT, BRESLIN, and GRAHAM, Appellate Military Judges.

PER CURIAM:

This case presents the question whether a United States Senator, who is also a reserve officer in the United States Air Force and assigned to this Court as an appellate military judge, is constitutionally or ethically disqualified from hearing this case (and, by implication, any case before this Court). Although the appellant has submitted his case "on its merits," [1] he has requested that Judge Lindsey O. Graham recuse himself from the case. Judge Graham declines to do so. The appellant, through counsel, asserts both constitutional infirmities and potential conflicts of interest. We will address each in turn.

## I. BACKGROUND

A special court-martial comprised of a military judge sitting alone found the appellant guilty, in accordance with his pleas, of the wrongful use of cocaine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The military judge sentenced the appellant to a bad-conduct discharge, confinement for 135 days, and reduction to E–1. In accordance with a pretrial agreement, the convening authority approved only so much of the sentence as included a bad-conduct discharge, confinement for 4 months, and reduction to E–1.

The case is before this Court for mandatory review under Article 66, UCMJ, 10 U.S.C. § 866. The chief judge assigned the case to a panel that includes Judge Lindsey O. Graham. Judge Graham is a colonel in the United States Air Force Reserve, has been duly attached to this Court to serve as an appellate military judge, and is a United States Senator from South Carolina. Judge Graham originally served on active duty in the United States Air Force as a judge advocate from January 1982 until August 1988, and then transferred to the Air Force Reserve where he was assigned until 1989. He served in the Air National Guard from 1989 to 1994, and then transferred back to the United States Air Force Reserve in 1995, where he has served until the present. Judge Graham is in the Standby Reserve. He was sworn into the United States House of Representatives in 1995 and to the United States Senate in January 2003.

The reserve forces of the United States are comprised of the Ready Reserve, the Standby Reserve, and the Retired Reserve. 10 U.S.C. § 10141(a). As a Member of Congress, Judge Graham is a "key employee." Department of Defense Directive (DODD) 1200.7, *Screening the Ready Reserve*, Enclosure 2 (18 Nov 1999). DODD 1200.7, ¶ 4.7 requires that such "key employees" be assigned to the Standby Reserve. Judge Graham is on the Active Status List within the Standby Reserve. In that capacity, he may participate in reserve training activities with-

---

1. Pursuant to Article 66, UCMJ, 10 U.S.C. § 866, this Court performs a full review of all court-martial cases within its jurisdiction, even if no specific errors are asserted by the appellant. In common appellate parlance, when a case is submitted without assertion of specific error(s), it is said to be submitted "on its merits."

out pay, may earn retirement points, and may compete for promotion. DODD 1235.9, *Management of the Standby Reserve,* ¶ 4.2.1 (10 Feb 1998). Members of the Ready, Standby, and Retired Reserve are subject to recall to active duty if Congress declares war or national emergency, or as otherwise authorized by law. 10 U.S.C. §§ 12301(a), 12306. Members in inactive or retired status may be ordered to active duty only if there are not enough qualified reserves or guardsmen in the required category. *Id.*

The appellate defense counsel, on behalf of the appellant, moved for Judge Graham to recuse himself. They asserted that Judge Graham's participation in this case violates the Ineligibility and Incompatibility Clauses of Article I, Section 6, of the United States Constitution, and "may raise concerns about potential conflicts of interest." The motion, signed by five appellate defense counsel, included a scant five paragraphs and few citations to authority. The government opposed the motion. The government argued the appellant had no standing to invoke the Incompatibility or Ineligibility Clauses and that the appellant had shown no disqualifying conflicts of interest that would preclude Judge Graham from serving on this case.

This Court subsequently granted the appellate defense counsel's request to file a reply to "prevent any misunderstanding that may arise from Appellant's decision not to aver more than he did." The brief reply asserted the appellant had standing to raise the Ineligibility and Incompatibility Clauses because, "Lt Col Graham will judge his case." Appellate defense counsel averred this created "a per se conflict of interest that is irreconcilable." The appellant defense counsel also alleged that Judge Graham's service on this Court will deny the appellant a proper appellate review because our superior courts would be incapable of properly reviewing the decision of a court panel that included "a United States Senator who has the power to limit or expand the scope of their appellate review and who has the power to fill vacancies in their courts by confirming presidential appointments to them."

## II. CONSTITUTIONAL CHALLENGES

We first address the contention that Judge Graham's service on this case violates the Ineligibility and Incompatibility Clauses of the United States Constitution. The Constitution provides:

No Senator or Representative shall, during the Time for which he is elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

U.S. CONST. art. I, § 6, cl. 2. The first portion is known as the Ineligibility Clause. It provides that Members of Congress are ineligible for appointment to certain offices of the United States, when the office was created or the "emoluments" increased during the time the Member served in Congress. The second portion is known as the Incompatibility Clause. It prohibits anyone holding an office of the United States from serving as a Member of Congress. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 210, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

The clauses had their origins in the principle of the separation of powers. *Reservists Committee to Stop the War v. Laird,* 323 F.Supp. 833, 835–37 (D.D.C.1971). The purpose was "to avoid the example of England, where, the Framers believed, elected officials had been subverted by appointments to office by the Crown." *Id.* at 835. The Ineligibility Clause and the Incompatibility Clause were considered to be "important guards against the danger of executive influence upon the legislative body." THE FEDERALIST No. 76 (Alexander Hamilton).

### A. Ineligibility Clause

■ We consider first the Ineligibility Clause. The appellate defense counsel did not attempt to articulate how Judge Graham's appointment as a member of the Standby Reserve or as a judge of this Court might violate the Ineligibility Clause. There is nothing to indicate that a commission as a reserve officer in the armed forces is a "civil

Office" as envisioned by the clause. Furthermore, it is not apparent that the "office" was created or the "emoluments" increased during Judge Graham's period of service in this Congress. Certainly, the Standby Reserve was not created during the 108th Congress. We also note that members of the Standby Reserve on the Active List work without pay; therefore, it is not clear whether any recent military pay raise would constitute an increase in the "emoluments" of the office. While a promotion may carry an increase in stature, it may not constitute an increase in "emoluments" where there is no accompanying raise in pay or benefits. Finally, although members of the Standby Reserve accrue points toward retirement, appointment to the Retired Reserve is a separate and distinct appointment; indeed, one that has not occurred. For these reasons, we find the Ineligibility Clause does not apply.

### B. Incompatibility Clause

■ We turn next to the Incompatibility Clause. The history of the clause indicates that it was the Framer's intention to preserve the separation of powers between the Legislative and Executive branches. The purpose was to prevent one branch from dominating or usurping the powers of another; it was not intended to eliminate cross-functionality or interaction between members of separate branches.

This understanding of the separation of powers doctrine has not, however, required that the three departments of government remain absolutely independent or "hermetically sealed" from one another. *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Indeed, the appearance of administrative agencies which combine functions characteristically associated with two or more of the departments of government demonstrates the potential for legitimate interaction or interdependence among the powers of government. *See Buckley v. Valeo,* 424 U.S. 1, 280–81, 96 S.Ct. 612, 755–56, 46 L.Ed.2d 659 (1976) (opinion of White, J.); *Humphrey's Executor v. United States,*

295 U.S. 602, 628–30, 55 S.Ct. 869, 874–75, 79 L.Ed. 1611 (1935).

*In re Application of the President's Commission on Organized Crime,* 763 F.2d 1191, 1195 (11th Cir.1985). As James Madison explained in THE FEDERALIST No. 47, the separation of powers doctrine does not mean that the various departments cannot have some partial agency in or control over each other. Rather, it is intended to prevent the situation where "the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department." *Id.* There are many instances in the history of this country where individuals from one branch have served in a specific function in another branch, without violating the separation of powers doctrine. While he was Chief Justice of the Supreme Court, John Jay also served as the negotiator of a treaty that averted war with England. *In re Application of the President's Commission on Organized Crime,* 763 F.2d at 1196 n. 4. Chief Justice Earl Warren served as the presiding officer of the investigation into the assassination of President John F. Kennedy. Justice Robert H. Jackson was the chief prosecutor in the Nuremburg Trials. Legislators have served on Presidential Commissions. Federal magistrates serve as officers in the reserve of the armed forces. Indeed, the judges of the Court of Appeals for the Armed Forces and the military courts of criminal appeals are officers of the Executive branch, serving as judges on a court created by Congress, acting in a judicial capacity. Articles 66 and 67, UCMJ, 10 U.S.C. §§ 866, 867. None of these instances cause one branch of government to dominate or control another branch, and thus do not violate the separation of powers doctrine. In the same way, a Member of Congress serving as a reserve officer of the armed forces does not create any danger that one branch would dominate or control another branch of the government.

As previously noted, the Incompatibility Clause makes any person holding an "Office under the United States" ineligible to serve as a Member of Congress. U.S. CONST. art. I, § 6, cl. 2. Even assuming that Congress intended the Incompatibility Clause to apply

to full-time active duty members of the military services, the issue is whether the clause applies to reservists as those positions were later created by Congress. Thus, we first examine whether an appointment as a reserve officer in the armed forces is an "Office under the United States" for the purpose of the clause. The parties make no argument on this issue.

Case law suggests that an officer in the Standby Reserve does not hold an "Office under the United States" as contemplated by the clause. In *United States v. Hartwell*, 6 Wall. 385, 73 U.S. 385, 393, 18 L.Ed. 830 (1867), the Court held that the term "office" "embraces the ideas of tenure, duration, emolument, and duties," noting that the duties in question "were continuing and permanent, not occasional or temporary." Similarly, in *United States v. Germaine*, 99 U.S. 508, 512, 25 L.Ed. 482 (1878), the Supreme Court found that where the individual was not appointed by the President, duties are only "occasional and intermittent," and the individual "is only to act when called on ... in some special case," the individual is not an officer of the United States. *See also Simmons v. United States*, 55 Ct.Cl. 56, 57 (1920); 45 Comp. Gen. 405 (1966) (retired military reserve personnel eligible for appointment as bankruptcy referees). Applying these criteria, members of the Standby Reserve do not occupy an "Office under the United States." As discussed above, they receive no emoluments during their service. The positions lack tenure or duration, and their duties are only "occasional or temporary."

Federal statutes also support the finding that members of the Standby Reserve do not hold offices of the United States. Congress specifically provided:

A Reserve of the armed forces who is not on active duty or who is on active duty for training is deemed not an employee or an individual holding an office of trust or profit or discharging an official function under or in connection with the United States because of his appointment, oath, or status, or any duties or function performed or pay or allowances received in that capacity.

5 U.S.C. § 2105(d). The plain language of the statute indicates Congress' intent that service in the reserves not be an office under the United States.

The legislative history of the statute supports that construction. We note that in *Reservists Committee to Stop the War v. Laird*, 323 F.Supp. at 838, the district court construed the legislative history of this statute to interpret it to apply only to counter a ruling of the Attorney General preventing reserve officers who were attorneys from practicing before the Treasury Department or performing other work forbidden by law to officers of the Government. A plain reading of that legislative history reveals that, while the dispute may have begun over reservists who were attorneys prosecuting claims against the United States, the legislative remedy Congress enacted was intended to have a far wider scope. The House Report indicated the legislation was intended "to more clearly define the status of reserve officers not on active duty or on active duty for training only." H. REP. No. 1884, 71st Cong., 2d Sess., pp. 2, 3. Although the House Report did refer to the Attorney General's ruling, it also considered the needs of "other reserve officers who are interested in the civil affairs of their own States," where the State Constitutions "deny State offices to citizens who are officials of the Federal Government." *Id.* at 3. The Senate Report copied the House Report. *See* S.REP. No. 1102, 71st Cong., 2d Sess.

On the Senate floor, Senator James Couzens explained the purpose of the legislation:

Mr. Couzens. Mr. President, the bill involves quite an intricate question, affecting reserve officers who may hold office in the Government in addition to the office which they hold in the military service. There is a constitutional inhibition against an officer in the military service holding two offices. There are officers in the Reserve Corps who are Members of the Senate and who are also Members of the House of Representatives, as there are reserve officers holding other governmental positions.

. . .

[This proposed legislation] is an attempt to [remedy the situation] by amending the

law so as to provide that reserve officers shall not be considered as officers referred to in the Constitution. In order to relieve the officers who are in the Reserve Corps and who are holding other governmental offices, from possible liability under the Constitution, it was thought that the passage of this [bill] was necessary.

72 Cong. Rec. 11881. The legislative history of 5 U.S.C. § 2105 reveals that Congress intended to provide that reserve officers did not hold offices under the United States for all purposes. *See Woods v. Covington County Bank*, 537 F.2d 804, 811 (5th Cir.1976); *American Federation of Government Employees v. Hoffman*, 543 F.2d 930, 942 (D.C.Cir.1976). *See also* 5 U.S.C. § 502 (membership in a reserve component does not prevent an individual from practicing civilian profession before, or in connection with, an agency of the United States); 5 U.S.C. § 5534 (reservist may accept civilian office under the government of the United States); 38 U.S.C. § 4301 et seq. (Uniformed Services Employment and Reemployment Rights Act of 1994, prohibiting discrimination against persons because of their service in the military). If an appointment as a reserve officer is not an "Office under the United States," the Incompatibility Clause may not apply.

### C. Standing

■ Assuming arguendo that a reserve commission is an "Office under the United States" for the purposes of the Incompatibility Clause, we must first consider whether the appellant has standing to assert this claim of error. The law of standing arises from the "case or controversy" requirement in Article III of the United States Constitution, which is also based upon the fundamental idea of a separation of powers. *Allen v. Wright*, 468 U.S. 737, 750, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The doctrine of standing is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

*Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C.Cir.1982) (Bork, J., concurring).

As noted above, the requirement for a "case or controversy" arises under Article III of the Constitution. Of course, this Court and the Court of Appeals for the Armed Forces are courts created by Congress under Article I. Nonetheless, Article I courts have also applied the standing requirement. *See, e.g., Anderson v. United States*, 344 F.3d 1343, 1350 n. 1 (Fed.Cir. 2003) ("The Court of Federal Claims, though an Article I court, 28 U.S.C. § 171 (2000), applies the same standing requirements enforced by other federal courts created under Article III"); *Zevalkink v. Brown*, 102 F.3d 1236, 1243 (Fed.Cir.1996) ("As a court established under Article I of the U.S. Constitution, the Court of Veterans Appeals is not bound to the 'case or controversy' requirement of Article III. However, it has decided, based on the same prudential considerations behind the 'case or controversy' requirement, i.e., courts should only decide real and substantial controversies, not hypothetical claims, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937), that it would refrain from deciding cases that do not present an actual case or controversy. *Mokal v. Derwinski*, 1 Vet. App. 12, 13 (1990)"); *Smith v. Fairbanks Capital Corporation*, 299 B.R. 687, 689 n. 1 (2003) ("Although bankruptcy courts are Article I courts rather than Article III courts, their jurisdiction is derived from the district courts. Because the jurisdiction of district courts is limited by the case or controversy requirement, so is the jurisdiction of the bankruptcy courts").

The Court of Appeals for the Armed Forces has also adopted the "case or contro-

versy" requirement. *United States v. Foster*, 40 M.J. 140, 145 n. 5 (C.M.A.1994) ("As the court below declined to approve findings of guilty of indecent assault, and as the legal sufficiency of such a specification is not before us, we will await the arrival of an actual *case or controversy* to decide that question") (emphasis added). *See also United States v. Tualla*, 52 M.J. 228, 232 (C.A.A.F.2000) ("Moreover, although we decline to offer a definitive interpretation of the relationship between Article 58b and RCM 1003(b)(3) in the absence of a specific case or controversy, we note that these two provisions are not necessarily in conflict"). Military courts have consistently applied the "standing" requirement to resolve cases. *See, e.g., United States v. Khamsouk*, 57 M.J. 282, 287 (C.A.A.F.2002); *United States v. New*, 55 M.J. 95, 129–30 (C.A.A.F.2001) (Everett, S.J., concurring); *United States v. Johnson*, 53 M.J. 459, 462 (C.A.A.F.2000); *United States v. Jones*, 52 M.J. 60, 64 (C.A.A.F.1999); *United States v. Salazar*, 44 M.J. 464, 467 (C.A.A.F.1996); *Porter v. Eggers*, 32 M.J. 583, 584 (A.C.M.R.1990); *United States v. Evans*, 6 M.J. 577, 580 (A.C.M.R.1978); *United States v. Bowie*, 34 C.M.R. 808, 813, 1964 WL 5110 (A.F.B.R.1964).

The various concepts that comprise the law of standing derive from developing case law.

Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked. The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. (Internal citations omitted.)

*Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. 3315. *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Thus, courts reviewing standing must find three core requirements: (1) direct injury, (2) traceability, and (3) redressability. *See* John C. Reitz, *American Law in a Time of Global Interdependence: U.S. National Reports to the XVIth International Congress of Comparative Law: Section IV: Standing to Raise Constitutional Issues*, 50 Am. J. Comp. L. 437, 441 (Fall 2002).

To determine, then, whether this appellant has standing to raise the constitutional violation alleged, we must examine the appellate defense counsel's contentions for direct injury, traceability, and redressability, as well as other judicially imposed limits. *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. 3315. A reviewing court's inquiry on standing must be especially rigorous when the dispute requires that court to decide whether an action taken by another branch of the Federal Government was unconstitutional. *Raines v. Byrd*, 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

1. Direct Injury

The most fundamental requirement for standing is that the party requesting relief has a "personal stake" in the outcome of the case. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In *Ex Parte Levitt*, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), the Supreme Court explained:

It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is in immediate danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public.

The claim must assert "injury in fact, economic or otherwise." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Americans United for Separation of Church & State v. HEW*, 619 F.2d 252, 256 (3d Cir.1980). This is the "direct injury" discussed in *Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. 3315. There the

Supreme Court phrased the reviewing court's inquiry into this aspect of standing in this way: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?" *Id.*

Federal courts have previously considered the specific issue before us: whether a particular party had standing to request that a court enforce the Incompatibility Clause to prevent Members of Congress from holding reserve commissions in the armed forces. During the Vietnam War, a large number of Members of Congress held reserve commissions in the armed forces. In *Reservists Committee to Stop the War v. Laird*, an association of present and former reservists dedicated to opposing the United States' involvement in the Vietnam conflict brought suit to require the Secretary of Defense and the service secretaries to eliminate any office inconsistent with the constitutional mandate. The plaintiffs claimed standing on several grounds: (1) as reservists, (2) as persons opposing the war in Vietnam, (3) as taxpayers, and (4) as United States citizens. 323 F.Supp. at 840. With regard to their status as reservists—the argument most akin to the case at bar—the plaintiffs argued they were injured by favoritism toward Congressmen in "assignments, promotion, and perquisites." *Id.* The District Court found this basis insufficient to confer standing. "Even were these allegations proved, it is doubtful whether plaintiffs' interests as Reservists are within the zone of those interests which the Clause was designed to protect." *Id.* The District Court did find standing, however, based on the plaintiffs' status as citizens of the United States.

Reviewing the case, the Supreme Court found the association of reservists had no standing either as taxpayers or as citizens of the United States. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. at 220, 228, 94 S.Ct. 2925. "[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Id.* at 220.

In *Ex Parte Levitt,* the petitioner moved for an order requiring Mr. Justice Black to show cause why he should be permitted to serve as an Associate Justice of the Supreme Court. The basis of the challenge was the Ineligibility Clause—before his appointment to the Supreme Court, Mr. Justice Black served as a senator when legislation was enacted permitting Justices to retire at full pay after a period of specified service, thereby increasing the emoluments of the office. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. at 219, 94 S.Ct. 2925. The interest cited by the petitioner was that of a citizen and as a member of the bar of the Supreme Court. Even though Justice Black would presumably join in deciding cases brought by the petitioner, the Court found that interest insufficient to confer standing. *Ex Parte Levitt,* 302 U.S. at 633, 58 S.Ct. 1.

Turning to the present case, the appellate defense counsel aver generally that Judge Graham's position as a United States Senator "is incompatible with that of an appellate judge" and they invite this Court to apply a "per se" rule. This is insufficient to confer standing.

First, the appellate defense counsel do not allege a direct injury. They attempt to do so by stating that Judge Graham "will judge his [appellant's] case." However, that states only a connection, not an injury. The act of judging is not inherently adverse to the appellant. Moreover, the appellate defense counsel have not raised any allegation of substantive or procedural error regarding the trial or appellate review of this case. The appellate defense counsel contend that Judge Graham is disqualified from serving as a military judge. However, as discussed at greater length below, the Incompatibility Clause operates to disqualify one holding an "Office under the United States" from membership in the Congress; it does not disqualify that Member from his office within the Executive branch. Where, as here, an officer is eligible and is properly appointed as an appellate military judge, he is presumed qualified to serve. The appellant's vague allegations of conflicts of interest, discussed *infra,* are without merit.

Secondly, the appellate defense counsel's allegation of incompatibility is nothing more than a general, abstract interest common to

all citizens. The Supreme Court has consistently found that such an interest does not confer standing. *Lujan v. Defenders of Wildlife*, 504 U.S. at 573–74, 112 S.Ct. 2130; *Allen v. Wright*, 468 U.S. at 754, 104 S.Ct. 3315; *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 227, 94 S.Ct. 2925; *United States v. Richardson*, 418 U.S. 166, 172, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Ex Parte Levitt*, 302 U.S. at 633, 58 S.Ct. 1. The appellant has failed to establish the specific harm required for standing.

### 2. Traceability

In addition to direct injury, a claimant must assert that the injury is to an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. at 153, 90 S.Ct. 827; *Americans United for Separation of Church & State v. HEW*, 619 F.2d at 256. This is the "traceability" requirement discussed in *Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. 3315.

In criminal cases, in order to find standing, federal courts also require evidence of a direct injury that is within the zone of interests to be protected. An example well-known to practitioners is that a defendant has no standing to object to the introduction of incriminating evidence on the grounds that it was obtained through an illegal search or seizure, if the accused had no Fourth Amendment interest in the area searched or the property seized. *See United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Wong Sun v. United States*, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Khamsouk*, 57 M.J. at 287–88; *United States v. Muniz*, 23 M.J. 201, 204 (C.M.A.1987). The accused may perceive a direct injury in that unlawfully seized evidence is being used against him at trial. But where that injury is not related to an interest the Constitution guarantees, the accused has no standing to object.

The appellate defense counsel have failed to allege or demonstrate "traceability"—

there is no showing the appellant's alleged injury is within the zone of interests the constitutional clauses in question were designed to protect. As noted earlier, the Incompatibility and Ineligibility Clauses were designed to protect the separation of powers between the three branches of our government; that is, to prevent one branch of the government from improperly influencing or controlling another branch. It was never intended that the branches of our government be wholly unconnected with each other or that there would not be some overlap of the functions of government. THE FEDERALIST NOS. 47, 48 (James Madison).

> What the separation of powers has been construed to prohibit is those arrogation of power to one branch of government which 'disrupt[ ] the proper balance between the coordinate branches,' *Nixon v. Administrator of General Services*, 433 U.S. at 443, 97 S.Ct. at 2790, or 'prevent[ ] [one of the branches] from accomplishing its constitutionally assigned functions,' *id.* (citing *United States v. Nixon*, 418 U.S. at 711–12, 94 S.Ct. at 3109–10).

*In re Application of the President's Commission on Organized Crime*, 763 F.2d at 1195. Members of Congress have served as reservists in our armed forces in large numbers over the years without upsetting the separation of powers. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 211 n. 2. Our appellate review of this case—even when the reviewing panel includes a sitting member of Congress—does not have any relation to the separation of powers among the Legislative, Executive, or Judicial branches. We conclude that the appellant has failed to meet the traceability requirement.

### 3. Redressability

Another "core component" of standing is "redressability;" that is, whether relief from the specific injury will follow from a favorable decision. *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. 3315. Redressability examines the causal connection between the alleged injury and the judicial relief requested. *Id.* at 753 n. 19.

The relief requested by the appellant is that Judge Graham recuse himself from this

case. The appellate defense counsel made a specific point to note that they are not requesting that Judge Graham be disqualified from serving as a judge on this Court, nor do they seek some declaratory judgment that no Member of Congress may serve in the reserve forces of the United States.

We must determine whether the alleged harm (a violation of the separation of powers doctrine) is likely to be redressed by the requested relief (recusal from this case). If, as the appellant contends, the Incompatibility Clause is violated when a Member of Congress holds any office in the Executive branch, then mere recusal will not redress this injury. Even if this Court granted the appellate defense counsel's request for recusal, Judge Graham would still be a Member of Congress and a reserve officer of the United States. Thus, the claim in this case lacks this essential component of standing as well.

4. Judicially Imposed Limit on Standing—Political Question

■ In addition to the core components of standing "derived directly from the Constitution" discussed above, standing doctrine also embraces several judicially self-imposed limits. *Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. 3315. This includes the "general prohibition on a litigant's raising another person's legal rights" and a rule "barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Id.* Courts consider whether adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. at 97, 88 S.Ct. 1942. This precept is the basis for the well-settled rule that courts will not adjudicate political questions. *Powell v. McCormack,* 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. at 210–11, 82 S.Ct. 691. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; ...

or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government...." *Id.* at 217, 82 S.Ct. 691.

The enforcement of the Incompatibility Clause is a political question reserved to Congress. Briefly stated, the Incompatibility Clause establishes a qualification for membership in the Congress and, under Article I, Section 5, clause 1 of the United States Constitution, only the Congress may judge and enforce qualifications for membership. It is not a matter suitable for adjudication by a court.

The plain text, history, and Congressional treatment of the Incompatibility Clause demonstrate that it was intended as a qualification for membership in the Congress, not for holding another federal office. The clause provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." The phrasing of the clause is similar to the language contained in Article I, Sections 2 and 3, relating to the qualifications for age, citizenship, and residency.

The history of the development of the language of the Incompatibility Clause further demonstrates that it was intended as a qualification for membership in the Congress. The original draft of the clauses made members of Congress "ineligible to, and incapable of holding" any office under the United States during the time they were in Congress. 2 Farrand, *The Records of the Federal Convention of 1787* p. 180 (1937 ed.); *Reservists Committee to Stop the War v. Laird,* 323 F.Supp. at 835–37. Notably, it was not couched as a qualification for membership in the Congress—indeed, it did not bar federal office holders from becoming members of Congress. However, the proposed clauses were amended, adding the language that became the Incompatibility Clause. 2 Farrand, *supra,* at 487, 490–92. There was little debate on the new language. *Id.* However, in THE FEDERALIST No. 52, James Madison wrote:

The *qualifications of the elected* ... have been very properly considered and regulated by the convention. A representative of the United States must be of the age of

twenty-five years; must have been seven years a citizen of the United States; must, at the time of his election, be an inhabitant of the State he is to represent; *and, during the time of his service, must be in no office under the United States.*

(Emphasis added.)

Congress has always treated the Incompatibility Clause as a qualification for membership in Congress. On many occasions, Congress considered whether to enforce Article I, Section 6, Clause 2 against its members who held offices under the United States. *See* 1 Hinds, *Precedents of the House of Representatives* §§ 485–506, pp. 592–636 (1907); 6 Cannon, *Precedents of the House of Representatives* §§ 60–65, pp. 64–79 (1936). More recently, Senator Barry Goldwater specifically raised the question whether reservists could serve in the Senate, noting, "The Senate is the judge of the qualifications of its own Members." 109 Cong. Rec. 8715–8717. The Senate adopted a resolution directing the Senate Judiciary Committee to consider the matter. *Id.* at 8718. However, the Judiciary Committee took no action on the resolution.

The power to judge and enforce the qualifications for membership in the Congress rests exclusively with the Congress. U.S. CONST. art. I, § 5, cl. 1. This power is not given to the courts. *Powell v. McCormack,* 395 U.S. at 550, 89 S.Ct. 1944.

Finally, the Executive branch has treated this matter as a qualification for membership in Congress, within the sole purview of Congress. For at least the past 60 years, Presidents have been advised that Congress alone retains the prerogative of removing violators of Article I, Section 6, Clause 2. In a 1943 opinion letter drafted at the request of the President, Attorney General Francis Biddle advised President Roosevelt on the issue of whether Members of Congress could be commissioned in the armed forces. 40 Op. Att'y Gen. 301 (1943). Attorney General Biddle was of the opinion that "Members of Congress may enter the armed forces," and "[u]pon entry into such service the individual ceases to be a Member of the Congress *provided the House or the Senate, as the case may be, chooses to act.*" *Id.* (emphasis add-

ed). Over 30 years later, Deputy Assistant Attorney General Leon Ulman echoed the sentiments of the 1943 letter, stating,

> we suggest that it would be undesirable for the President himself to attempt to confront the problem. If he were to inform the Congressman that in his view the holding of reserve commissions by Members of Congress did violate Article I, § 6, clause 2, that determination certainly would not bind the Congress. Conversely, if he stated that the practice was permitted by the Constitution, Congress could enforce the clause against its Members notwithstanding.

1 Op. O.L.C. 242, 245 (1977). The President has not acted to enforce these clauses in the appointment of Members of Congress to commissions in the reserve military forces of the United States.

Congress is undoubtedly aware of the clauses in question. As noted above, the Supreme Court previously considered a challenge under the Incompatibility and Ineligibility Clauses against Members of Congress holding commissions in the reserve forces. In *Schlesinger v. Reservists Committee to Stop the War,* the Court noted:

> At the time suit was filed, 130 Members of the 91st Congress were also members of the Reserves, which are divided into Ready, Standby, and Retired components. By the end of the 92d Congress, 119 Members were reservists. As of November 2, 1973, the 93d Congress has seen the number of its reservists reduced to 107, all but one of whom are commissioned officers, App. 5, and none of whom can occupy the Ready Reserve status of the individual respondents, *supra,* n. 1. Dept. of Defense Directive 1200.7 § v, c. 2 (July 2, 1970); *32 CFR § 125.4(c)(2).* Of the 107, 20 (including the one enlisted man) are in the active, and 12 in the inactive, Standby Reserve; and 73 are in the Retired Reserve, 16 of whom receive retirement pay.

418 U.S. at 211 n. 2, 94 S.Ct. 2925.

Since that time, Congress has not taken action to disqualify Members who serve in the reserves of the armed forces. Public records indicate 154 Members of the 108th

Congress have had some form of military service. At the present time, Judge Graham is the only United States Senator serving in the reserves of the armed forces. There are five United States Representatives currently in the reserves: Steve Buyer (R–IN), Mark Kirk (R–IL), John Shimkus (R–IL), Roger Wicker (R–MS) and Joe Wilson (R–SC). Many Members of Congress have over 20 years of service and are eligible for retired reserve status, including Leonard Boswell (D–IA), Thomas Carper (D–DE), Howard Coble (R–NC), Randy Cunningham (R–CA), Jim Gibbons (R–NV), Henry Hyde (R–IL), James Jeffords (I–VT), Sam Johnson (R–TX), John Kline (R–MN), John McCain (R–AZ), John Murtha (D–PA), Jack Reed (D–RI), Edward Schrock (R–VA), Rob Simmons (R–CT), and John Tanner (D–TN).

Whether the Congress should enforce this provision against one of its members is a political question. For the reasons discussed above, it would be improper for this Court to express a judgment on the issue. More significantly, such a decision would not have any effect, because the authority to determine qualifications is within the exclusive power of Congress. U.S. CONST. art. I, § 5, cl. 1. We conclude this matter is, above all, a political question properly reserved for the judgment of Congress.

### III. CONFLICTS OF INTEREST

■ In addition to the constitutional challenge, the appellate defense counsel allege that Judge Graham's participation on this case may raise concerns about "potential conflicts of interest." We have considered this argument carefully and find it to be without merit.

Military law establishes codes of ethical standards and judicial conduct for appellate military judges. Article 66(h), UCMJ, 10 U.S.C. § 866(h), provides that appellate military judges are disqualified from hearing cases in which they have previously served as an investigating officer, a court member, military judge, trial or defense counsel, or reviewing officer. Rule for Courts–Martial (R.C.M.) 902 is based upon 28 U.S.C. § 455 and establishes both general and specific grounds for disqualification of military judges. Additionally, the Judge Advocate

General of the Air Force, acting pursuant to the authority delegated by the President under R.C.M. 109, promulgated *The Air Force Uniform Code of Judicial Conduct* (15 October 2002). Under this code, appellate military judges are required to maintain the integrity and independence of the judiciary, avoid behaving with impropriety or the appearance of impropriety, perform judicial duties diligently and impartially, preside or participate in a professional and orderly court, determine and apply justice promptly, and ensure the preservation of the rights of individual service members.

The appellate defense counsel raise several allegations that, they submit, require Judge Graham to recuse himself in this case. We will address each in turn.

The appellate defense counsel assert one basis for disqualification as follows:

> For example, The Judge Advocate General (TJAG), who appointed Lt Col Graham, will rate his performance on the Court. TJAG, on the other hand, will look to the United States Senate in the future to approve his own retirement in the grade of Major General. In addition, it is a matter of public record that Lt Col Graham serves on the Senate Armed Services Committee, which directly impacts the interests of the United States Air Force.

It is not immediately apparent how this allegation requires Judge Graham's recusal. Certainly it does not assert a basis for disqualification under Article 66(h), UCMJ, R.C.M. 902, 28 U.S.C. § 455, or the *Air Force Uniform Code of Judicial Conduct*. Instead, the allegation infers that The Judge Advocate General would be subject to the influence of Judge Graham. We find this allegation to be groundless, speculative, and remote. Of course, this argument also undermines the appellate defense counsel's position—if it were true, it would simply reinforce Judge Graham's independence from any hypothetical improper influence.

The appellate defense counsel similarly assert that Judge Graham's participation will harm the appellant because our superior courts, the United States Court of Appeals for the Armed Forces and the United States

Supreme Court, will be improperly influenced by his participation. The appellate defense counsel aver:

> Appellant will be denied a proper review of his case by an independent judiciary at all stages of his appeal when this Court's superior courts review the judicial opinion of a United States Senator who has the power to limit or expand the scope of their appellate review and who has the power to fill vacancies in their courts by confirming presidential appointments to them.

This argument suffers the same flaw as its predecessor. It does not show that Judge Graham is subject to improper influence; rather, it reinforces his independence. On a more practical level, we find it utterly unpersuasive. The judges and justices of our superior courts review on a daily basis the constitutionality of the laws passed by Congress and the regulations promulgated by the President. This is a necessary and proper function of our courts. No student of the law seriously suggests that the power of judicial review is inherently self-disqualifying. Thus, it is far-fetched to believe that reviewing the judicial opinion of one senator serving in a judicial role would have an improper or chilling effect on our superior courts. Moreover, the judges and justices of our superior courts serve judicial appointments of 15 years and life, respectively, to insulate them from any improper influence. Article 142(b)(2), UCMJ, 10 U.S.C. § 942(b)(2); U.S. Const. art. III, § 1. Finally, Senator Graham's vote is only one in one hundred within the Senate; thus, the possibility of adverse effects from his official actions in the Senate would be particularly remote.

The appellate defense counsel further assert that Judge Graham cannot serve because "he is accountable to his constituents for the decision and opinions he renders as a member of the Court." Of course, that is simply not true. When he is serving as a United States Senator, he is a representative of the citizens of South Carolina. But when he is serving as a reserve officer in the United States Air Force, he is bound to uphold the interests of the United States. And when that reserve duty is as an appel-late military judge, his sworn obligation is to uphold the Constitution of the United States. If the appellate defense counsel's argument were valid, no judge could hold membership in any other organization, including civic groups, political parties, or religions. However, that is not required. *See generally, Air Force Uniform Code of Judicial Conduct,* Canon 4 (15 October 2002).

"All judges come to the bench with a background of experiences, associations, and viewpoints." *United States v. Alabama,* 828 F.2d 1532, 1543 (11th Cir.1987). These are not necessarily disqualifying.

> [T]he experience a judge has acquired does not supply a basis for seeking his disqualification, and this is true whether such experiences were acquired in his personal life, during the course of practicing law, in his previous position in the executive branch of government, in his past role as a state legislator, or when he was acting as a member of Congress.

*United States v. Gorski,* 48 M.J. 317, 319 (C.A.A.F.1997) (mem.) (quoting R. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* 311–12 (1996)).

Under our code and practice, judge advocates involved in litigation and appellate practice must set aside any possible outside influences to perform their sworn duties in each case. Article 42(a), UCMJ, 10 U.S.C. § 842(a). One need look no further than military defense counsel, who are at once officers of the United States Air Force, sworn to uphold its laws, and also counsel for their clients in litigation against the United States. We presume that the professional attorneys who undertake these important functions discharge their duties competently and diligently. Of course, it is possible that a case may arise that presents a legitimate conflict for Judge Graham. In that event, Judge Graham, like any other judge, will recuse himself. This is not such a case.

## IV. CONCLUSION

After careful consideration of the motion for recusal, Judge Graham determines such recusal is not necessary or appropriate. The Court finds that the appellant lacks standing to object to Judge Graham's appointment as a reserve officer in the United States Air

Force under the Ineligibility or Incompatibility Clauses of the United States Constitution. The Court also finds no reasonable basis for concluding that Judge Graham "would bring to the proceedings in this case an attitude or state of mind resistant to fair and dispassionate inquiry, or that recusal is otherwise required." *Gorski,* 48 M.J. at 323. The motion for recusal of Judge Graham is denied.

The findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge BRESLIN participated in this decision prior to his retirement.